# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MARIAN FOUTTY,

       Plaintiff,

                                 Civil Action 2:18-cv-00285

    v.                            Chief Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## OPINION AND ORDER

Plaintiff, Marian Foutty ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability Insurance benefits ("SSDI").  This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 17), the Commissioner's Memorandum in Opposition (ECF No. 22), the administrative record (ECF No. 11), and the supplemental administrative record (ECF No. 12.).  Plaintiff did not file a Reply.  For the following reasons, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's decision is **AFFIRMED**.

## I.  BACKGROUND

Plaintiff applied for disability benefits on March 10, 2014.  (R. at 301–05.)  Plaintiff's claim was denied initially and upon reconsideration.  (R. at 14.)  Upon request, a hearing was held on December 5, 2016, in which Plaintiff, represented by counsel, appeared and testified.  (R. at 646–94.)  A vocational expert also appeared and testified at the hearing.  (R. at 686–93.)

On March 3, 2017, Administrative Law Judge Regina Carpenter ("the ALJ") issued a decision finding that Plaintiff was not disabled at any time from December 1, 2012, the alleged onset date, through December 31, 2014, the date last insured. (R. at 11–29.) On January 30, 2018, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–6.) Plaintiff then timely commenced the instant action. (ECF No. 1.)

## II. RELEVANT HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified that she is right-handed, 5 feet six inches tall, and 135 pounds. (R. at 657.) She further testified that she is married and has one son. (*Id.*) She indicated that she has a driver's license but drives "as little as possible." (R. at 657–578.) She estimated that she normally drives about six minutes twice a day. (R. at 658.) Plaintiff testified that she went to twelfth grade plus did vocational education as a hairdresser. (*Id.*) As a hairdresser, she sometimes had to lift more than twenty pounds. (R. at 660.) She testified that she has no difficulty with basic math. (R. at 658.)

Plaintiff stated that her husband recently retired because she "was having a lot of trouble at home by [herself], taking care of [her] son and the house and doing things." (R. at 662.) She expressed concern because she had left her car running in the driveway for three or four hours and that she left the gas on the stove on. (*Id.*) She stated that these types of things started happening not too long after her brain surgery. (*Id.*) Plaintiff said that she has migraines one to three times a week that usually last all day. (R. at 664.)

Plaintiff indicated that she uses a cane "only sometimes" and that it was not prescribed to her. (R. at 668.) She said that she uses the cane because "when [she has] to do a lot of stairs or

with [her] son's functions it, you know, the football games and stuff like that, to climb bleachers and things like that, [she] just can't do it." (*Id.*) She also testified that she has instability being up on her feet and falls "all the time." (*Id.*) Plaintiff also stated that she has memory problems "every single day." (R. at 670.) She testified that she naps for two hours in the afternoon every day. (R. at 680.)

## B. Vocational Expert Testimony

Linda Devack testified as the vocational expert ("VE") at the December 2016 hearing. (R. at 686–93.) The VE testified that Plaintiff's past work included work as a hairdresser, low skilled, light exertional level. (R. at 687.) The ALJ asked the VE to assume a hypothetical individual the same age as Plaintiff, with the same education and work background, who is capable of performing light work as defined in the regulations but has the following limitations: should have a sit/stand option which would allow for a brief change of position for one to two minutes every thirty minutes; no balancing, crouching, crawling, or climbing of ladders, ropes, or scaffolds; no more than occasional stooping or climbing of stairs or ramps; no concentrated exposure to extreme heat and cold, wetness and humidity, vibration or respiratory irritants; no exposure to hazards such as dangerous moving machinery or unprotected heights; the work must be limited to simple and routine instructions and tasks, with no assembly line or fast-paced production requirements; only occasional changes in work routine or work setting; little independent decision-making or goal setting; no contact with the public; and no more than occasional interaction with coworkers and supervisors. (R. at 687–88.)

Assuming those limitations, the VE testified that the hypothetical individual would not be able to perform Plaintiff's past work "as the past work skill level is greater than unskilled mentioned in the hypothetical." (R. at 688.) The VE further testified that the hypothetical

individual would be capable of performing work as a garment sorter, laundry sorter, and garment bagger.  (R. at 688–89.)  The VE testified that if a limitation was added that the hypothetical individual would need to use a cane while walking up or down stairs that would not affect the ability to perform work as a garment sorter, laundry sorter, and garment bagger.  (R. at 689.) The VE also testified that if handling and fingering were limited to frequent in the left non-dominant hand, that would not affect the ability to perform work as a garment sorter, laundry sorter, and garment bagger.  (*Id.*)  Additionally, the VE testified that generally ten percent of time off-task is tolerated in this type of work and one to two days a month of absenteeism is tolerated in this type work.  (*Id.*)

Assuming the first hypothetical but adding limitations of needing instructions to be demonstrated with no written instructions, occasional fingering and handling with the left non-dominant hand, and frequent fingering and handling with the right dominant hand, the VE testified that the individual could perform work as a wear cleaner, pad machine offbearer, and collator operator.  (R. at 690–92.)  The VE further testified that if the limitation was made to occasional bilaterally, the three previous jobs would be eliminated and there would not be any work available for the individual at the light level.  (R. at 692.)  The VE also testified that if a limitation was added that the individual required occasional redirection a third of the day, in unskilled, there would not be any work available for the individual.  (*Id.*)

### III.   RELEVANT MEDICAL RECORDS

#### A.  Regional Medical Group, LLC

On February 28, 2014, Lynn Miller, NP of Regional Medical Group, LLC saw Plaintiff. (R. at 450–52.)  Plaintiff reported that she was on venlafaxine but weaned herself off because it made her worse.  (R. at 450.)  On physical exam, Ms. Miller noted that Plaintiff had a normal

appearance, her skin was warm and dry, her abdomen did not have any masses or hernias, and there was tenderness at the right supraspinatus tendon and muscle. (R. at 451.) On a review of systems, Ms. Miller noted that Plaintiff had left side weakness, extreme sensitivity to heat and cold, and that her head was numb from surgery. (*Id.*)

On March 17, 2014, Ramesh Thimmiah, M.D. of Regional Medical Group, LLC saw Plaintiff. (R. at 453–56.) Dr. Thimmiah noted that Plaintiff complained of neck and bilateral shoulder pain. (R. at 453.) On physical exam, Dr. Thimmiah noted that Plaintiff had a normal appearance, her skin was warm and dry, her abdomen had no masses or hernias, and there was tenderness in the left occipital area and left upper shoulder. (R. at 454.) On a review of systems, Dr. Thimmiah noted that Plaintiff indicated severe headaches and migraines, but no ringing in her ears, no loss of appetite, no muscle aches, no leg swelling, no joint pain, and no seizures. (*Id.*)

On May 15, 2014, Dr. Thimmiah saw Plaintiff. (R. at 461–64.) Dr. Thimmiah noted that Plaintiff wanted to discuss disability and was there for medication management of her Xanax. (R. at 461.) On physical exam, Dr. Thimmiah noted that Plaintiff had a normal appearance, her skin was warm and dry, her abdomen had no masses or hernias, and there was tenderness in the supraspinatus tendon. (R. at 462.) On a review of systems, Dr. Thimmiah noted that Plaintiff indicated headaches, sinus congestion, stress, and depression, but no fever, no fatigue, no chest pain, no loss of appetite, no muscle aches, no leg swelling, no joint pain, and no seizures. (*Id.*)

On June 16, 2014 Dr. Thimmiah saw Plaintiff. (R. at 457–60.) Dr. Thimmiah noted that Plaintiff complained of headaches off and on along with problems with her weight. (R. at 457.) On physical exam, Dr. Thimmiah noted that Plaintiff had a normal appearance, her skin was warm and dry, her abdomen had no masses or hernias, neck stiffness, and tenderness in the

supraspinatus tendon.  (R. at 458.)  On a review of systems, Dr. Thimmiah noted that Plaintiff indicated headaches, sinus congestion, neck pain, stress, and depression, but no fever, no fatigue, no muscle aches, no leg swelling, no joint pain, and no seizures.  (*Id.*)

On August 11, 2014, Dr. Thimmiah saw Plaintiff.[1]  (R. at 465–67.)  Plaintiff reported that she recently had to go to the emergency room due to hurting her back.  (R. at 465.)  She also reported that she was not sleeping.  (*Id.*)  On physical exam, Plaintiff was noted as having a normal appearance, warm and dry skin, no masses or hernias in her abdomen, and tenderness in the supraspinatus tendon.  (R. at 466.)  No review of systems was recorded for this visit.  (*Id.*)

On October 6, 2014, Dr. Thimmiah saw Plaintiff.  (R. at 468–71.)  Plaintiff denied shortness of breath, chest pain, nausea, vomiting, diarrhea, fever, and dizziness.  (R. at 468.)  On physical exam, Dr. Thimmiah noted Plaintiff had a normal appearance, her skin was warm and dry, her abdomen had no masses or hernias, normal judgment and insight, normal recent and remote memory, normal mood, that she seemed able to handle stress, and tenderness in the right shoulder and supraspinatus tendon.  (R. at 469.)  On a review of systems, Dr. Thimmiah noted that Plaintiff indicated right shoulder pain and poor sleep, but no fever, no fatigue, no ringing in her ears, no numbness in extremities, and no seizures.  (*Id.*)

On December 8, 2014, Dr. Thimmiah saw Plaintiff.  (R. at 478–81.)  Plaintiff complained of left arm pain starting at her neck and going down her left arm.  (R. at 478.)  Dr. Thimmiah noted that Paxil was doubled at Plaintiff's last visit and that she was doing better.  (*Id.*)  On physical exam, Dr. Thimmiah noted that Plaintiff had a normal appearance, her left lateral arm had early macular lesions, and tenderness in her neck, left shoulder, and supraspinatus tendon.

---

[1] The record indicates that Dr. Thimmiah saw Plaintiff, but the report from August 11, 2014 was signed by Ms. Miller, not Dr. Thimmiah.  (R. at 467.)

(R. at 479.)  He also noted that Plaintiff had normal judgment and insight, was oriented to person, place, and time, and had normal recent and remote memory.  (*Id.*)  On a review of systems, Dr. Thimmiah noted that Plaintiff indicated left neck and shoulder pain and poor sleep, but that she was doing better on Paxil, had no fever, no fatigue, no chest pain, no loss of appetite, no numbness in extremities, and no seizures.  (*Id.*)

**B. David R. Bousquet, M.Ed.**

On April 23, 2014, Mr. Bousquet completed a psychological evaluation of Plaintiff.  (R. at 413–20.)  Plaintiff stated that she started using drugs and alcohol when she was fifteen-years-old but that she has not used either since before her son was born.  (R. at 415.)  Plaintiff also stated that she stopped working in 2009 because she was beginning to experience seizures and ultimately discovered that she had aneurysms.  (*Id.*)  She denied difficulties relating with coworkers, bosses, or customers.  (*Id.*)  Plaintiff reported currently experiencing emotional and psychological problems.  (R. at 416.)  She reported that sometimes she eats too much but sometimes she can go a couple days without eating.  (*Id.*)  She also reported problems falling asleep and experiencing nighttime awakenings with difficulty returning to sleep.  (*Id.*)

Plaintiff reported being depressed and becoming tearful once or twice a week.  (*Id.*)  She denied suicidal and homicidal thoughts.  (*Id.*)  She also reported a sense of guilt and worthlessness, varying energy, racing thoughts, rapid heartrate, problems attending and concentrating, feeling irritable and angry, low self-esteem, and forcing herself to care for her son and household chores and duties.  (*Id.*)  She further reported that she obtains enjoyment when she spends time in nice weather and rides her bicycle.  (*Id.*)  She also reported struggles with memory including forgetting to turn the ignition off in her car, leaving the water running, leaving stove burners on, and forgetting where she puts things and what people say to her.  (*Id.*)  She

further reported that she must be reminded to go to appointments but denied problems with remembering to take her medicine. (*Id.*)

Regarding activities of daily living, Plaintiff reported that she tries to read and will garden and maintains flower gardens. (R. at 417.) She further reported that she will do inside chores when motivated including loading and unloading the dishwasher, cooking, cleaning, and folding laundry. (*Id.*) She reported her husband does the laundry, though, because it is located in the basement. (*Id.*) Plaintiff reported watching television, especially forensic crime shows, but also the news. (*Id.*) She reported using the computer and Facebook. (*Id.*) She also reported riding her bicycle. (*Id.*) She reported that she rarely has visitors but sometimes a friend will stop by or she will visit the friend or others. (*Id.*) Plaintiff reported that she does not attend church or belong to any groups or organizations. (*Id.*)

Mr. Bousquet noted that Plaintiff had a neat and clean appearance and was dressed appropriately for the weather. (*Id.*) He further noted that she was cooperative during the evaluation and did not exhibit any body odors. (*Id.*) He indicated that her speech "was 100% understandable[,]" as well as sustainable and goal oriented. (*Id.*) He did, however, indicate that her speech tended to be pressured and at times she spoke rapidly. (*Id.*) He noted her affect was appropriate and her mood at times was sad and anxious, but she did not show signs of anger or irritability. (*Id.*) Mr. Bousquet indicated that Plaintiff was restless and fidgety throughout the evaluation. (*Id.*) He also indicated that she had difficulties attending and concentrating but was easily refocused. (*Id.*)

Mr. Bousquet indicated that Plaintiff was oriented to time, place, person, and situation. (R. at 418.) Plaintiff denied experiencing hallucinations, recurring obsessions, or compulsions. (*Id.*) Mr. Bousquet noted that there were no indications of a formal thought disorder nor were

there indications of delusional thinking. (*Id.*) Plaintiff responded correctly to five of the five arithmetic problems. (*Id.*) Mr. Bousquet opined that Plaintiff demonstrated cognitive abilities that would fall in the average range. (*Id.*) He further opined that her "reasoning and judgment capacities appear to fall at age appropriate levels but at times may be influenced by her psychological difficulties." (*Id.*) He indicated that Plaintiff "would be able to participate in decisions affecting the future and to conduct her own living arrangements." (*Id.*) He noted that no psychological testing was requested or conducted. (*Id.*) His prognosis was that at this time Plaintiff "would experience neither significant resolution of the symptoms nor significant deterioration in the mental functioning." (*Id.*)

Mr. Bousquet indicated that Plaintiff's self-report of her emotional and psychological difficulties did not exceed what was observed in the interview process. (R. at 419.) He further indicated that she did not exhibit any significant inconsistencies in her self-report and that her self-reported data appears to be reliable. (*Id.*) Mr. Bousquet made the following summary and conclusions:

> During the evaluation the [Plaintiff] emphasized concerns about her health and medical difficulties and her emotional and psychological functioning. Bipolar Disorder NOS and Poly-substance dependence sustained full remission are supported by the available information. She is being prescribed psychotropic medication by her primary car[e] physician. The [Plaintiff] reports that her current stressors are health and medical and emotional and psychological.

(*Id.*)

> Mr. Bousquet made the following functional assessment:

> The [Plaintiff] reported graduating from high school. The [Plaintiff's] presentation throughout the interview supported intellectual functioning that would fall in the average range. The available information indicates that she would be able to understand, remember and carry out instructions in a work setting consistent with individuals who possess average intellectual capabilities.

Throughout the 49-minute interview the [Plaintiff] did have problems with maintaining attention and concentration. She does describe being distracted by her thoughts and feelings. She also reports fluctuations in her levels of energy and motivation. When depressed she has problems with energy and is not motivated. There are other times when she has a great deal of energy and at times she has some problems channeling the energy adaptively and appropriately. Available information indicates that from an emotional and psychological prospective [sic] there will be times where she will have difficulties with abilities to maintain attention and concentration and also with abilities to maintain appropriate persistence and pace in a work setting. The findings indicate that she has the capabilities of engaging in simple as well as multi-step tasks.

The [Plaintiff] did not have any difficulties with relating with the examiner throughout the evaluation. She denied problems relating with coworkers and supervisors when employed. She reports that generally she does not experience any significant difficulties within her interpersonal relationships. She will occasionally become irritated and angry and may act out these emotions. Available information indicates that from an emotional and psychological perspective she will have some difficulties with abilities to conform to social expectations in a work setting primarily because of her fluctuations in moods.

During the evaluation she did state that in the past she had [sic] had difficulties with managing stress and pressure and would abuse both drugs and alcohol. She reports that currently under the conditions of stress and pressure she finds that she will become tearful and continues to struggle with moodiness particularly frustration and anger. She also reports that under the conditions of stress and pressure she will become anxious, she worries and is fearful. Available information indicates that from an emotional and psychological perspective there will be times when she will have some difficulties with abilities to respond appropriately to work place stresses and pressures.

(R. at 419–20.)

## C. Daily Activities Questionnaires

On April 30, 2014, Ronald G. Sass, MS LPCC completed a Daily Activities Questionnaire regarding Plaintiff. (R. at 421–22.) Mr. Sass reported that he first saw Plaintiff on April 14, 2014 and had seen her on the day he authored the report, April 30, 2014. (R. at 422.) Regarding "what behaviors or deficits prevent independent living," Mr. Sass indicated this was not applicable. (R. at 421.) He noted that Plaintiff said she gets "along great" with friends and gets "along okay" with neighbors. (*Id.*) He also noted that Plaintiff said her family relationships

are strained.  (*Id.*)  Mr. Sass indicated that Plaintiff reported she visits with friends once every couple months for four to five hours.  (*Id.*)  When asked how she got along with former employers, supervisors, and co-workers, Plaintiff said she gets "along with everybody" and that she had "no problems" during past regular work.  (*Id.*)

Regarding attempts to return to work, Plaintiff said her balance was "off" and that she has "limited use" of her left hand.  (*Id.*)  When asked to describe or give examples of anything that might prevent work activities for a usual work day or work week, Plaintiff said "balance is off, can't use left hand, [her] short-term memory and concentration are not good, [and she has] trouble standing for long periods of time."  (*Id.*)  Plaintiff reported that for food preparation it takes her a while, but she gets it done.  (R. at 422.)  She further reported that with household chores she cannot keep up without help from her spouse and son.  (*Id.*)  Regarding personal hygiene, Plaintiff did not report any problems.  (*Id.*)  She reported that shopping is too taxing, and she limits her driving to short distances and only during the day.  (*Id.*)  Plaintiff reported that her husband does all the banking and paying bills.  (*Id.*)  She also reported that her hobbies are limited but that she does some gardening during which she sits down.  (*Id.*)

On December 11, 2014, Mr. Sass completed another Daily Activities Questionnaire regarding Plaintiff.  (R. at 483–84.)  Mr. Sass opined that Plaintiff's memory could impede independent living and that she has difficulty climbing stairs and descending stairs.  (R. at 483.)  Plaintiff reported she visits with family and friends "some[,]" for a few hours at a time.  (*Id.*)  She described her past regular work "like a big family."  (*Id.*)  For attempts to return to work, Mr. Sass indicated this was not applicable.  (*Id.*)  When asked to describe or give examples of anything that might prevent work activities for a usual work day or work week, Mr. Sass noted excessive fatigue, poor concentration, easily confused, and short-term memory problems.  (*Id.*)

He noted that Plaintiff was able to prepare basic meals and left notes to herself to help her remember to turn off the stove. (R. at 484.) He also noted that Plaintiff's spouse helps a great deal with household chores. (*Id.*) For personal hygiene, Mr. Sass indicated that Plaintiff was able to care of herself. (*Id.*) For shopping, Mr. Sass indicated that Plaintiff is unable to spend a great deal of time in public due to distress, lack of tolerance, and poor memory. (*Id.*) He noted that Plaintiff can drive short distances but that she indicated she would rather have someone else drive. (*Id.*) He noted that Plaintiff's spouse assumes responsibility for banking and bill paying. (*Id.*) For hobbies, Mr. Sass indicated that Plaintiff did not regularly engage in any hobbies. (*Id.*)

### D. May 2014 CT-Angiogram

On May 23, 2014, Plaintiff had a CT-Angiogram of her head. (R. at 423–24.) The findings were as follows:

> Again noted is a moderate sized area of encephalomalacia involving the right temporal and parietal lobes consistent with sequela of prior infarct. This was present on 10/29/2010. There is stable mild ex vacuo dilatation of the occipital horn of the right lateral ventricle. The ventricles are otherwise normal in size, shape, and position. There is no shift of the midline structures. There is no further evidence of intra or extra-axial mass, abnormal density or fluid collection.

> There is no evidence of pathologic enhancement.

> Again noted is metallic density with hardening artifact within the right temporal region consistent with patient's history of aneurysm clipping in this region.

> The distal internal carotid arteries, the A1 and A2 and M1 and M2 segments of the anterior and middle cerebral arteries, the distal vertebral arteries, the basilar arteries, as well as the left posterior cerebral artery demonstrate normal enhancement without evidence of aneurysm or significant stenosis. There is non-visualization of the P1 segment of the right posterior cerebral artery suggesting vessel occlusion. The P2 segment of the right posterior cerebellar artery is normal in appearance and is supplied via the right posterior communicating artery.

(*Id.*) The impressions were as follows:

> No CTA evidence of aneurysm.

Status on post right MCA aneurysm clipping which was present on 10/29/2010.

Suspected occlusion of the P1 segment of the right posterior cerebral artery. The P2 segment is normal and is supplied via the right PCA.

Stable area of encephalomalacia involving the right temporal and parietal lobes with stable ex vacuo dilation of the occipital horn of the right lateral ventricle compared to 10/29/2010.

(R. at 424.)

### E. Gabriel Sella, M.D.

On July 22, 2014, Dr. Sella saw Plaintiff for manual muscle testing. (R. at 430–33.) He noted everything as normal, which is defined as "can raise part against maximal resistance." (R. at 430.) He also noted that muscle spasms, spasticity, clonus, primitive reflexes, and muscle atrophy were not present. (R. at 431.) He opined that Plaintiff had a normal range of motion for her cervical spine, shoulder, elbow, wrist, hands, and fingers. (R. at 431–32.) On the same day he completed a disability determination examination of Plaintiff regarding the testing. (R. at 434–39.)

He noted that Plaintiff walked in and out of the office with the cane, "but did not need it at all during the examination." (R. at 436.) He further noted that Plaintiff got on and off the exam table without difficulty and got dressed and undressed without difficulty. (*Id.*) He opined that Plaintiff had "[q]uestionable judgment, insight and memory, as well as mental status." (*Id.*) He further opined that Plaintiff could perform the following work-related activities: "sitting without restrictions, standing & walking 5-10 minutes at one time several times a day, lifting & carrying light to moderate weights, handling light to moderate weight objects, hearing, speaking and traveling." (R. at 438.)

### F.  Jefferson Behavioral Health

On November 7, 2014 Plaintiff was admitted to Jefferson Behavioral Health.  (R. at 440–
46.)  Plaintiff's Assignment Sheet indicates that she came to intake due to "moodiness."  (R. at
441.)  Plaintiff reported that her goals of treatment were "to get [her] head back on."  (*Id.*)  She
reported her marriage was "blah" and that it felt more like they were roommates.  (*Id.*)  She also
reported severe anxiety and moderate depression.  (*Id.*)  Plaintiff reported that she feels like her
balance can be off, as well as her judgment.  (*Id.*)  She also reported that she has lost interest in
doing things, does not sleep well, has variable energy, and feels anger internally.  (*Id.*)  For
current mental status, her mood was indicated as anxious, her affect was indicated as appropriate,
and her thought process was indicated as decreased attention span, distractibility, and impaired
concentration.  (R. at 442.)  Plaintiff reported her hobbies and interests included outside
gardening.  (R. at 444.)

### G.  Medical Source Statements

On May 4, 2015, Paula Dawson, LPCC completed a Medical Source Statement regarding
Plaintiff's mental capacity.  (R. at 485–86.)  Under "please identify diagnosis and symptoms that
support this assessment," Ms. Dawson wrote "mood [disorder], head trauma from aneurysm,
emotional instability, memory - concentration issues, [and] poor peer interactions."  (R. at 486.)
Ms. Dawson opined the following:

| Making Occupational Adjustments | | | | |
|---|---|---|---|---|
| | Constant | Frequent | Occasional | Rare |
| Follow work rules | | X | | |
| Use judgment | X | | | |
| Maintain attention and concentration for extended periods of 2 hour segments | | | | X |
| Respond appropriately to changes in routine settings | | | | X |
| Maintain regular attendance and be punctual within customary tolerance | | X | | |

| | Constant | Frequent | Occasional | Rare |
|---|---|---|---|---|
| Deal with the public | X | | | |
| Relate to co-workers | | X | | |
| Interact with supervisor(s) | | X | | |
| Function independently without redirection | | X | | |
| Work in coordination with or proximity to others without being distracted | | | X | |
| Working in coordination with or proximity to others without being distracting | | X | | |
| Deal with work stress | | | X | |
| Complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods | | | | X |

| Intellectual Functioning | Constant | Frequent | Occasional | Rare |
|---|---|---|---|---|
| Understand, remember and carry out complex job instructions | | | | X |
| Understand, remember and carry out detailed, but not complex job instructions | | | X | |
| Understand, remember and carry out simple job instructions | | X | | |

| Making Personal and Social Adjustment | Constant | Frequent | Occasional | Rare |
|---|---|---|---|---|
| Maintain appearance | X | | | |
| Socialize[2] | | X | | |
| Behave in an emotionally stable manner[3] | | | X | |
| Relate predictably in social situations | | | X | |
| Management of funds/schedules | | | | X |
| Ability to leave home on own | X | | | |

(R. at 485–86.)

On December 15, 2015, Ms. Dawson completed another Medical Source Statement regarding Plaintiff's mental capacity. (R. at 536–37.) This form was co-signed by Surinder K. Singh, M.D. (R. at 537.) Under "please identify diagnosis and symptoms that support this

---

[2] There is a mark in the both the "constant" and "frequent" columns, but the mark in the "constant" column is crossed out. (R. at 486.)

[3] There is a mark in both the "frequent" and "occasional" columns, but the mark in the "frequent" column is crossed out. (R. at 486.)

assessment," Ms. Dawson wrote "other persistent mood [disorder]."  (R. at 537.)  Ms. Dawson

opined the following:

| Making Occupational Adjustments | | | | |
|---|---|---|---|---|
| | Constant | Frequent | Occasional | Rare |
| Follow work rules | | | | X |
| Use judgment | | | | X |
| Maintain attention and concentration for extended periods of 2 hour segments | X | | | |
| Respond appropriately to changes in routine settings | | X | | |
| Maintain regular attendance and be punctual within customary tolerance | | | X | |
| Deal with the public[4] | | | X | |
| Relate to co-workers | | | | X |
| Interact with supervisor(s) | | | | X |
| Function independently without redirection | | | X | |
| Work in coordination with or proximity to others without being distracted | | | X | |
| Working in coordination with or proximity to others without being distracting[5] | | | | |
| Deal with work stress | | X | | |
| Complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods | | X | | |

| Intellectual Functioning | | | | |
|---|---|---|---|---|
| | Constant | Frequent | Occasional | Rare |
| Understand, remember and carry out complex job instructions[6] | | X | | |
| Understand, remember and carry out detailed, but not complex job instructions[7] | | X | | |
| Understand, remember and carry out simple job instructions | | | X | |

[4] There is a mark in the both the "occasional" and "rare" columns, but the mark in the "rare" column is crossed out.  (R. at 536.)

[5] Dr. Singh left this row blank.  (R. at 536.)

[6] There is a mark in both the "constant" and "frequent" columns, but the mark in the "constant" column has "error" written on top of it.  (R. at 537.)

[7] There is a mark in both the "constant" and "frequent" columns, but the mark in the "constant" column has "error" written on top of it.  (R. at 537.)

| Making Personal and Social Adjustment | | | | |
|---|---|---|---|---|
| | Constant | Frequent | Occasional | Rare |
| Maintain appearance | | | | X |
| Socialize | | | | X |
| Behave in an emotionally stable manner | | | | X |
| Relate predictably in social situations | | | | X |
| Management of funds/schedules | | X | | |
| Ability to leave home on own | | | | X |

(R. at 536–37.)  Both Medical Source Statements indicated that Plaintiff had been under the care of Ms. Dawson's practice or facility since November 7, 2014.  (R. at 486, 537.)

### H.  State Agency Physicians and Psychologists

State agency physicians Frank Stroebel, M.D., and Diane Manos, M.D., both found that Plaintiff was able to perform a range of light work with an option to sit/stand at the workstation and avoidance of all exposure to work place hazards.  (R. at 214–27, 229–41.)  State agency psychologists Irma Johnston, Psy.D. and Bonnie Katz, Ph.D., found that Plaintiff had no more than moderate limitations, which warranted a finding of no disabling mental health conditions. (*Id.*)

### IV.   ADMINISTRATIVE DECISION

On March 3, 2017, the ALJ issued her decision.  (R. at 11–29.)  At step one of the sequential evaluation process,[8] the ALJ found that Plaintiff had not engaged in substantial

---

[8] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

gainful activity during the period from her alleged onset date of December 1, 2012 through her date last insured of December 31, 2014.  (R. at 16.)  The ALJ found that through the date last insured, Plaintiff had the following severe impairments:  cerebral aneurysm, status post clipping in 2010; occlusion of the right posterior cerebral artery; encephalomalacia from prior stroke; headaches; obesity; mood disorder; depressive disorder; anxiety state; bipolar disorder; and hypomanic personality disorder.  (R. at 17.)  The ALJ further found that through the date last insured Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") through the date last insured as follows:

> [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations:  a sit/stand option allowing a change of position briefly for one to two minutes every 30 minutes; no balancing, crouching, crawling, or climbing of ladders, ropes, or scaffolds; no more than occasional stooping or climbing of stairs or ramps; allow for use of a cane while walking up and down stairs; no more than frequent handling and fingering with the non-dominant left hand; no concentrated exposure to extreme heat and cold, wetness and humidity, vibration, or respiratory irritants; no exposure to hazards, such as dangerous moving machinery or unprotected heights; limited to simple and routine instructions and tasks with no assembly line, no fast paced production requirements, no more than occasional changes in work routine or work setting, and little independent decision making or goal setting; and no contact with the public and no more than occasional interaction with co-workers and supervisors.

(R. at 20.)

---

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Relying on testimony from the VE, the ALJ concluded that through the date last insured, Plaintiff was unable to perform any past relevant work as a hair dresser, caregiver, and janitor. (R. at 27.)  The ALJ found that through the date last insured, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.  (R. at 27–28.)  She therefore concluded that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from December 1, 2012, the alleged onset date, through December 31, 2014, the date last insured.  (R. at 28.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

Plaintiff asserts two assignments of error. Plaintiff contends that "substantial evidence does not support the residual functional capacity assessment as determined by the administrative law judge." (ECF No. 17, at pg. 12.) Plaintiff also asserts that the ALJ "erred in the weight provided to the consultative examiner and the treating mental health providers." (*Id.* at pg. 16.) The Court addresses each contention in turn.

### A. Residual Functional Capacity

In her first assignment of error, Plaintiff argues that substantial evidence does not support the conclusion in the RFC that she could perform light work activity and the ALJ should have determined there would be limitations with respect to off-task behavior and/or being absent from the workplace. (*Id.* at 12–16.) The Court disagrees.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e).

Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted). Notably, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d).

Here, the ALJ set forth Plaintiff's RFC as follows:

> [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: a sit/stand option allowing a change of position briefly for one to two minutes every 30 minutes; no balancing, crouching, crawling, or climbing of ladders, ropes, or scaffolds; no more than occasional stooping or climbing of stairs or ramps; allow for use of a cane while walking up and down stairs; no more than frequent handling and fingering with the non-dominant left hand; no concentrated exposure to extreme heat and cold,

wetness and humidity, vibration, or respiratory irritants; no exposure to hazards, such as dangerous moving machinery or unprotected heights; limited to simple and routine instructions and tasks with no assembly line, no fast paced production requirements, no more than occasional changes in work routine or work setting, and little independent decision making or goal setting; and no contact with the public and no more than occasional interaction with co-workers and supervisors.

(R. at 20.)  20 C.F.R. § 404.1567 defines light work:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Plaintiff maintains that the medical evidence provides for further restrictions than the ALJ determined.  (ECF No. 17, at pg. 13.)  Specifically, Plaintiff asserts that the medical evidence indicated limitations with her shoulder, neck, and legs beyond what was accounted for in the ALJ's RFC determination.  (*Id.* at 13–14.)  Plaintiff points to her examination by Dr. Sella for support.  In his report following the examination, Dr. Sella concluded that Plaintiff could sit without restrictions, stand/walk five to ten minutes at one time several times a day, lift and carry light to moderate weights, and handle light to moderate weight objects.  (*Id.* at 14; R. at 438.)

The ALJ considered Dr. Sella's opinion and found that it was "not fully supported by the [Plaintiff's] treatment records[,]" and specifically that "the longitudinal record does not indicate any substantial abnormalities that would so significant[ly] limit the [Plaintiff's] abilities to stand and walk."  (R. at 22, 25.)  The ALJ afforded Dr. Sella's opinion "little weight."  (R. at 25.)  Substantial evidence supports the ALJ's conclusion regarding the medical evidence surrounding Plaintiff's ability to stand/walk.  For example, Dr. Sella himself indicated that Plaintiff was

"normal" in her extremities, meaning she could raise that part of her body against maximal resistance. (R. at 430.) Furthermore, Dr. Sella found no muscle spasms, spasticity, clonus, primitive reflexes, or muscle atrophy. (R. at 431.) Dr. Sella also opined that Plaintiff had a normal range of motion for her extremities and spine. (R. at 431-32.) While Dr. Sella noted that Plaintiff entered and exited the office with a cane, she "did not need it at all during the examination." (R. at 436.)

Other evidence also supports the ALJ's conclusion. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."). For instance, at various doctor appointments in 2014, Plaintiff reported no muscle aches, no leg swelling, no joint pain, and no numbness in her extremities. (R. at 454, 458, 462, 469, 479.) Additionally, only two months before her examination with Dr. Sella, Plaintiff reported to Mr. Bousquet that she rides her bicycle. (R. at 417.). The ALJ properly took this information into account in developing the RFC. *See Foster v. Brown*, 853 F.2d 483, 489–90 (6th Cir. 1988) ("The determination of Residual Functional Capacity involves consideration not only of history, findings, and observations from medical sources, but also of other relevant evidence, such as reports of the individual's activities of daily living[.]" (citation omitted)).

Furthermore, the ALJ did not ignore Plaintiff's standing/walking limitations in her RFC determination. Indeed, she included in Plaintiff's RFC determination "a sit/stand option allowing a change of position briefly for one to two minutes every 30 minutes." (R. at 20.). The ALJ did not err in this regard. *See Blackman v. Comm'r of Soc. Sec. Admin.*, No. 1:12-cv-2715, 2014 WL 991943, at *3 (N.D. Ohio March 13, 2014) ("[T]he ALJ did not ignore Plaintiff's

shoulder impairment . . . . When formulating the RFC, the ALJ . . . at least considered the impairment, making it inappropriate to remand on this note."); *see also Morrow v. Comm'r of Soc. Sec.*, No. 1:08-cv-233, 2009 WL 891706, at *2 (W.D. Mich. March 31, 2009) ("[T]he ALJ did not ignore the PA's RFC assessment. The ALJ reviewed the restrictions that [the PA] had listed in her assessment, and then explained why the assessment was entitled to little weight[.]").

Plaintiff also asserts that the ALJ "did not even consider" the "ongoing problems with [her] neck and shoulder[, which] would limit her ability to reach[.]" (ECF No. 17, at pg. 14.) This assertion, however, is not borne out in the record. The ALJ specifically considered Plaintiff's allegations of pain:

> The undersigned has also considered [Plaintiff's] history of substance abuse and allegations of back pain and shoulder pain. July 2014 imaging of the lumbar spine found only mild degenerative disc disease and there were no acute compression deformities identified. Lumbar vertebral bodies were normal in stature and alignment. Exhibit B5F. The longitudinal record reflects no diagnostic abnormalities regarding [Plaintiff's] shoulder. . . . Therefore, the undersigned finds that the conditions are non-severe impairments that cause no more than a minimal limitation upon functioning and/or are not a medically determinable impairment. Nevertheless, the residual functional capacity, discussed below, more than adequately accommodates the effect of these impairments acting in concert with the severe physical impairments.

(R. at 17.) The ALJ considered Plaintiff's impairment when formulating the RFC, making it inappropriate to remand in this regard. *Blackman*, 2014 WL 991943 at *3. Furthermore, while Plaintiff cites to symptoms and diagnoses in support of this assertion, diagnoses alone are not conclusive evidence of disability. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition.") (citing *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988) (diagnosable impairment not necessarily disabling)); *Dillon v. Astrue*, No. 1:09-cv-896, 2011 WL 900987, at *4 (S.D. Ohio Feb. 14,

2011) ("[A] diagnosis, in and of itself, is not conclusive evidence of disability because it does not reflect the limitations, if any, that it may impose upon an individual.") (citations omitted).

Plaintiff also contends that she "consistently complained of headaches and/or migraines[,]" along with difficulty with her short-term memory, and that the ALJ's RFC determination does "not fully encompass these severe impairments." (ECF No. 17, at pg. 15.) Specifically, Plaintiff asserts that the ALJ's RFC determination does not account for off-task behavior or missing work due to the headaches. (*Id.* at 16.) The ALJ, however, "is not required to accept [Plaintiff's] subjective complaints and may properly consider the credibility of [Plaintiff] when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The ALJ found that treatment records indicated Plaintiff's complaints about headaches were that her headaches were "off and on." (R. at 22–23.)

Substantial evidence supports the ALJ's RFC determination with respect to Plaintiff's limitations regarding headaches and short-term memory. For example, a May 2014 CT-Angiogram indicated no CTA evidence of aneurysm. (R. at 423–24.) Additionally, treatment records from 2014 noted that Plaintiff had normal judgment, insight, and recent and remote memory. (R. at 469, 479.) Mr. Bousquet noted that Plaintiff's "reasoning and judgment capacities appear to fall at age appropriate levels" and that while she had difficulties attending and concentrating, she was "easily refocused." (R. at 417–18.) Furthermore, Plaintiff's activities of daily living contradicted her self-reported symptoms. For example, she took care of her personal hygiene, gardened outside, read, did word puzzles and brain exercises, performed household chores with assistance, watched television including forensic shows and the news, used social media, rode her bicycle, and drove short distances. (R. at 417, 422, 444, 484, 657–58, 679.); *see* 20 C.F.R. § 404.1529(c)(3) (activities and treatment considered in evaluating

subjective complaints); *Foster*, 853 F.2d at 489–90 (activities of daily living are involved in consideration of the RFC determination).

Overall, the state agency physicians and psychologists' opinions did not support the extreme limitations which Plaintiff asserts ought to have been included in the RFC determination. (R. at 214–27, 229–41.) The ALJ considered these opinions in making her RFC determination. (R. at 26–27.) The determination of a plaintiff's RFC is entirely within the purview of the ALJ, and "this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth*, 402 F.3d at 595. Here, substantial evidence supported the ALJ's RFC determination. Accordingly, Plaintiff's first contention in her Statement of Errors is **OVERRULED**.

### B. Consultative Examiner and Mental Health Providers

In her second assignment of error, Plaintiff argues that the ALJ erred in the weight assigned to consultative examiner Mr. Bousquet and mental health providers Ms. Dawson and Dr. Singh. (*Id.* at 16–21.) As an initial matter, to the extent that Plaintiff asserts that all three people are treating sources, this assertion is incorrect regarding Mr. Bousquet.

Ordinarily, the ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502. The Court must determine whether an ongoing treatment relationship exists at the time the physician's opinion is rendered. *Kornecky v. Comm'r of Soc.*

*Sec.*, No. 04-2171, 167 F. App'x 496, 506 & 506 n.10 (6th Cir. 2006) ("[T]he relevant inquiry is . . . whether [claimant] had the ongoing relationship with [the physician] *at the time he rendered his opinion*. . . . [V]isits to [the physician] *after* his RFC assessment could not retroactively render him a treating physician at the time of the assessment.") (emphasis in original); *see also Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) ("These two examinations did not give [the physician] a long term overview of [the claimant's] condition."). This is because "the rationale of the treating physician doctrine simply does not apply" where a physician issues an opinion after a single examination. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

Here, Mr. Bousquet examined Plaintiff in a "49-minute interview" on only one occasion. (R. at 413–20.) As noted above, a source does not qualify as a treating physician after issuing an opinion based on a single examination. *Andres v. Comm'r of Soc. Sec.*, 733 F. App'x 241, 245 (6th Cir. 2018) (noting that plaintiff was mistaken in suggesting ALJ was required to give controlling weight to consultative examiner who only examined plaintiff one time) (citing *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 467 (6th Cir. 2017) (one-time meeting with a psychological consultative examiner does not "create the on-going treatment relationship necessary to apply the treating source rule" and the ALJ is entitled to give less weight to the consultative examiner's opinion)). Accordingly, Mr. Bousquet was not a treating source for Plaintiff.

The ALJ found as follows regarding Mr. Bousquet's opinion:

Turning to the opinion evidence, the undersigned has considered the opinions of consultative examiner David Bousquet, M.Ed. Mr. Bousquet opined that [Plaintiff] was able to understand, remember and carryout instructions in a work setting consistent with individuals who possess average intellectual capabilities. He opined that the available information indicates that from an emotional and psychological prospective there will be times where she will have difficulties with

27

abilities to maintain attention and concentration and also with abilities to maintain appropriate persistence and pace in a work setting, but that she has the capabilities of engaging in simple as well, as [sic] multi-step tasks. He opined that from an emotional and psychological prospective she would have some difficulties with abilities to conform to social expectations in a work setting primarily because of fluctuations in moods. He opined that from an emotional and psychological prospective she would have some difficulties with abilities to respond appropriately to work place stresses and pressures. Exhibit 2F. This assessment is not particularly probative in this case because he has not offered any specific functional limitations, but rather offered vague and not particularly helpful statements regarding [Plaintiff's] abilities. Accordingly, the undersigned has afforded the opinions of Mr. Bousquet limited weight; however, the undersigned notes that the areas of deficit assessed by Mr. Bousquet are generally accommodated in the residual functional capacity.

(R. at 25.) Substantial evidence supports the ALJ's findings. For example, the state agency psychologists opined that Plaintiff had no greater than moderate limitations and was capable of working. (R. at 214–27, 229–41.) Additionally, although Mr. Bousquet indicated that Plaintiff would have some difficulties with abilities to conform to social expectations in a work setting, Plaintiff had denied problems relating with coworkers and supervisors when employed and reported that generally she does not experience any significant difficulties within her interpersonal relationships during the examination with Mr. Bousquet. (R. at 415, 419–20.) The United States Court of Appeals for the Sixth Circuit has held that an ALJ may properly discount a consultative examiner's opinion when it is inconsistent with his own examination report and the record as a whole. *Bowman v. Comm'r of Soc. Sec.*, 683 F. App'x 367, 375 (6th Cir. 2017).

Plaintiff also asserts that the ALJ "should send specific questions to Mr. Bouquet to address her concerns regarding the limitations which should be imposed and/or obtain medical expert testimony." (ECF No. 17, at pg. 19.) This argument fails because, under the regulations, "the agency will recontact a consultative examiner for clarification when the examiner's report is inadequate or incomplete." *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 122 (6th Cir. 2016) (internal quotations omitted) (citing 20 C.F.R. § 404.1519p(b)). When the agency reviews

a consultative examiner's report, it will consider whether the report provides "evidence which serves as an adequate basis for decisionmaking in terms of the impairment it assesses." *Id.* (quoting 20 C.F.R. § 404.1519p(a)(1)). Because Mr. Bousquet's limitations conflicted with other record evidence, along with parts of his own report, the ALJ properly gave limited weight to his opinion. *Id.* Furthermore, because Mr. Bousquet's report was not inadequate or incomplete, the ALJ had no obligation to contact him or obtain medical expert testimony for clarification. *See id.*

Plaintiff also asserts that the ALJ erred in the weight assigned to two medical source statements about Plaintiff completed by Ms. Dawson, with Dr. Singh co-signing the second one. (R. at 485–86, 536–37.) Both statements indicated that Plaintiff had been under the care of the practice where Ms. Dawson and Dr. Singh worked since November 7, 2014. (R. at 486, 537.) Ms. Dawson completed the first statement on May 4, 2015, and the second on December 15, 2015. (R. at 485–86, 536–37.) Both statements, therefore, were completed *after* Plaintiff's date last insured of December 31, 2014. Plaintiff asserts, however, that despite the fact that these reports were completed after the date last insured, "there was no significant mental health change which would have negated a reason not to extrapolate the limitations to the date last insured." (ECF No. 17, at pg. 20.)

The ALJ found the following regarding these opinions:

On May 4, 2015, Paula Dawson, L.P.C.C. completed a medical source statement. Ms. Dawson opined that the majority of [Plaintiff's] ability to make occupational adjustments were constant to frequent. However, she opined [[Plaintiff] could rarely maintain attention and concentration for extended periods of two-hour segments, complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods or respond appropriately to changes in routine settings. She opined [Plaintiff] could occasionally work in coordination with or proximity to others without being distracted or deal with work stress. She opined [Plaintiff] could rarely understand, remember, and carryout [sic] complex

job instructions, occasionally understand, remember and carry out detailed, but not complex job instructions, and frequently understand, remember and carry out simple job instructions. She opined [Plaintiff] could rarely manage funds/schedules, occasionally behaving in an emotionally stable manner or relate predictably in social situations, frequently socialize, and constantly maintain appearance and ability to leave home on own. Exhibit B11F. Then, on December 15, 2015, Surinder Singh, M.D. completed a medical source statement. Dr. Singh opined that [Plaintiff] could rarely follow work rules, use judgment, relate to co-workers, interact with supervisors, occasionally maintain regular attendance, deal with public, function independently without redirection, work in coordination with or proximity to others without being distracted, and frequently or constantly make other occupational adjustments. He opined she could frequently understand, remember and carryout [sic] complex job instruction[s] and understand, remember and carry out detailed, but not complex job instructions and occasionally understand, remember and carryout [sic] simple job instructions. He opined [Plaintiff] could rarely make personal and social adjustments, except frequently manage funds/schedules. Exhibit B16F. Notably, these opinions were completed after the period at issue and provides little insight into [Plaintiff's] limitations during the period at issue. Indeed, during the period at issue, [Plaintiff] sought no more than conservative medication management from her primary care physician. Additionally, the longitudinal medical evidence of record reflects no treatment provided by Dr. Singh, but rather by Paula Dawson, L.P.C.C., whom it appears actually completed this assessment and was just signed by Dr. Singh. Further, the treatment records do not support the severity of limitations assessed. In fact, the treatment records indicate [Plaintiff's] symptoms were in a moderate range. Therefore, the undersigned affords little weight to these medical source statements as the severity of limitations assessed by Ms. Dawson and Dr. Singh are not supported by the longitudinal medical evidence of record during the period at issue through December 31, 2014.

(R. at 25–26.)

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(d). The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of [the plaintiff's] impairment(s), including [their] symptoms, diagnosis and prognosis, what [they] can still do despite impairment(s), and [their] physical or mental restrictions." 20. C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the plaintiff's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Despite this, there is no requirement that the ALJ expressly consider each of the *Wilson* factors within the written decision. *Walker v. Comm'r of Soc. Sec.*, No. 2:15-cv-558, 2016 WL 692548, at *13 (S.D. Ohio Feb. 22, 2016); *see also Tilley v. Comm'r of Soc. Sec.*, No. 09-6081, 2010 WL 3521928, at *6 (6th Cir. Aug. 31, 2010) (indicating that, under *Blakely* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(d)(2) for weighing medical opinion evidence within the written decision).

However, an ALJ must "give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [a] treating source's opinion." 20 C.F.R. §

416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> The requirement of reason-giving exists, in part, to let [plaintiffs] understand the disposition of their cases, particularly in situations where a [plaintiff] knows that his [or her] physician has deemed him [or her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she [or he] is not, unless some reason for the agency's decision is supplied.

*Wilson*, 378 F.3d at 544–45 (internal quotations and citation omitted). Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the [plaintiff] as disabled." *Germany—Johnson v. Comm'r of Soc. Sec.*, 312 F. App'x 771, 777 (6th Cir. 2008) (citation omitted).

Finally, the Commissioner reserves the power to decide certain issues, such as a plaintiff's RFC. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity" of a plaintiff's impairments, opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, Ms. Dawson does not qualify as a treating source because she is a licensed professional clinical counselor. *See* 20 C.F.R. §§ 404.1502, 404.1513(d); SSR 06-03p, 2006 WL 2329939, at *2 (August 9, 2006). Ms. Dawson, therefore, is considered an "other source" whose opinion is not a "medical opinion." *Id.*; *see also* 20 C.F.R. § 404.1527(a)(2). Pursuant to SSR 06-03p,

> Although 20 CFR 404.1527 and 416.927 do not address explicitly how to evaluate evidence (including opinions) from "other sources," they do require consideration

of such evidence when evaluating an "acceptable medical source's" opinion. For example, SSA's regulations include a provision that requires adjudicators to consider any other factors brought to our attention, or of which we are aware, which tend to support or contradict a medical opinion. Information, including opinions, from "other sources"—both medical sources and "non-medical sources"—can be important in this regard. In addition, and as already noted, the Act requires us to consider all of the available evidence in the individual's case record in every case.

SSR 06-03p, 2006 WL 2329939 at *4. It appears from the record that Ms. Dawson completed both medical source statements, even though the second one was signed by Dr. Singh. (R. at 485–86, 536–37.)

In any event, the ALJ properly discounted these opinions. The medical source statements are inconsistent with the longitudinal medical evidence of record during the period at issue through December 31, 2014. *See DiMarco v. Astrue*, No. 07-2561, 2008 WL 471690, at *10 (W.D. Tenn. Feb. 19, 2008) ("The ALJ's evaluation of the substantiality of the evidence must be based upon the record as a whole, and does not permit a selective reading of the record." (internal quotations and citation omitted)). For example, the State agency psychologists found that Plaintiff had no more than moderate limitations, in contrast to the medical source statements which indicated that Plaintiff could only "rarely" perform in certain areas. (R. at 214–27, 229–41, 485–86, 536–37.) Furthermore, the second medical source statement indicated that Plaintiff could "rarely" relate to co-workers and "rarely" interact with supervisor(s). (R. at 536–37.) Plaintiff, however, had stated previously that she got "along with everybody" at her former work and had "no problems" during past regular work. (R. at 421.) In her examination with Mr. Bousquet, Plaintiff again denied difficulties relating with coworkers, bosses, or customers. (R. at 415.) Moreover, the medical source statements are inconsistent with each other. The ALJ properly evaluated the opinion for these reasons. *Chadwick v. Comm'r of Soc. Sec.*, No. 1:07-cv-856, 2009 WL 777392, at *8 (S.D. Ohio March 20, 2009) (concluding that the ALJ did not err in

declining to refer to a physician's opinion where the physician's two assessments were inconsistent with one another without any explanation) (citing *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994). Indeed, the two statements only indicated the same answer in one of the twenty-two categories. (R. at 485–86, 536–37.) Plaintiff provided no medical evidence to indicate such a drastic difference from the first medical source statement to the second. Additionally, the record evidence indicates that Plaintiff was receiving only conservative treatment for her ailments, which constitutes a good reason for discounting a treating source opinion. (*See* R. at 421–22, 430–33, 440–46, 450–81); *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) (citing *Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (finding the ALJ reasonably discounted a doctor's proposed limitations because, among other things, the claimant was receiving conservative treatment) & *McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 WL 687680, at *4 (6th Cir. May 19, 2000) ("Plaintiff's complaints of disabling pain are undermined by his non aggressive treatment.")).

Finally, as noted above, Plaintiff asserts that despite the fact that these forms were completed after the date last insured, "there was no significant mental health change which would have negated a reason not to extrapolate the limitations to the date last insured." (ECF No. 17, at pg. 20.) However, "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004) (citing *Cornett v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264, n.6 (6th Cir. 1988)). "Medical evidence after the date last insured is relevant only when the evidence 'relates back' to the claimant's limitations prior to the date last insured." *Abbomerato v. Comm'r of Soc. Sec. Admin.*, No. 5-14-cv-391, 2014 WL 6879330, at *11 (N.D. Ohio Dec. 4, 2014)

(citing *Walton v. Astrue*, 773 F. Supp. 2d 742, 750 (N.D. Ohio 2011)). The related-back

evidence:

> is relevant only if it is reflective of a claimant's limitations prior to the date last
> insured, rather than merely his impairments or condition prior to this date. *See* 20
> C.F.R. § 416.945(a)(1) ("Your impairment(s), and any related symptoms, such as
> pain, may cause physical and mental limitations that affect what you can do in a
> work setting. Your residual functional capacity is the most you can still do despite
> your limitations.").

*Walton*, 773 F. Supp. 2d at 750 (citing *Higgs*, 880 F.2d at 863 (post-coverage medical evidence

is relevant to whether claimant was limited by her condition during the operative time period)).

Here, Plaintiff cannot show that any of the medical evidence dated after December 31,

2014 described her condition prior to December 31, 2014. Although Plaintiff argues that issues

relevant in the medical source statement can be found in the record prior to the date last insured,

the standard is whether the later evidence reflects Plaintiff's limitations prior to December 31,

2014. *See Abbomerato*, 2014 WL 6879330 at *11 (citing *Walton*, 773 F. Supp. 2d at 750); *see

also Berry v. Astrue*, No. 1:10-cv-435, 2011 WL 5239222, at *5 (S.D. Ohio August 10, 2011)

(evidence of worsening back condition in the months after the date last insured properly

excluded by ALJ because there was no evidence that back pain resulted in disabling pain before

date last insured). Plaintiff has not shown that medical evidence after the date last insured relates

back to her limitations prior to that time, and the ALJ properly excluded the evidence. *See

Abbomerato*, 2014 WL 6879330 at *11 (citing *Walton*, 773 F. Supp. 2d at 750). Accordingly,

Plaintiff's second contention in her Statement of Errors is **OVERRULED**.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Court concludes that substantial

evidence supports the ALJ's decision denying benefits. Accordingly, Plaintiff's Statement of

Errors is **OVERRULED**, and the Commissioner's decision is **AFFIRMED**.  The Clerk is

**DIRECTED** to enter judgment in accordance with this Order and terminate this case.

       **IT IS SO ORDERED**.


**Date: August 20, 2019**                             */s/ Elizabeth A. Preston Deavers*_____
                                               **ELIZABETH A. PRESTON DEAVERS**
                                               **CHIEF UNITED STATES MAGISTRATE JUDGE**